**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| DWAYNE MCCLELLAND,<br><br>Plaintiff,<br><br>v.<br><br>HAMMOND POLICE OFFICER JAMES BIGHAM, STAR NO. HA 518; HAMMOND POLICE OFFICER J. CARRASCO, STAR NO. 646; and the CITY OF HAMMOND, a municipal corporation,<br><br>Defendants. | CAUSE NO.: 2:23-CV-78-TLS |

**OPINION AND ORDER**

This matter is now before the Court on the Defendants' Joint Motion for Summary Judgment [ECF No. 63]. This lawsuit stems from the September 4, 2022 arrest of the Plaintiff Dwayne McClelland for disorderly conduct and resisting law enforcement. *See* Compl., ECF No. 1; Am. Compl., ECF No. 6. The Plaintiff brings federal constitutional claims under 42 U.S.C. § 1983, alleging Fourth Amendment claims of excessive force against Defendant Hammond Police Officer James Bigham and failure to intervene against Hammond Police Officer Defendant J. Carrasco. *See* Am. Compl. The Plaintiff also brings a claim against the Defendant City of Hammond under Indiana law for indemnification. *Id*.

The Defendants filed their Joint Motion for Summary Judgment on July 23, 2026. ECF Nos. 63–67. The Plaintiff filed a response, ECF Nos. 68–70, on August 21, 2026; and the Defendants filed a reply, ECF No. 71, on September 3, 2026. For the reasons set forth below, the Court grants the Joint Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## BACKGROUND AND MATERIAL FACTS[1]

### A. Events Leading to the Plaintiff's Arrest

On September 4, 2022, Defendant Sergeant James Bigham and Defendant Officer J. Carrasco, both police officers employed by the City of Hammond, responded to 4738 Cameron

[1] The facts offered by the parties are considered only to the extent they are supported by the cited evidence of record. The Defendants did not provide a reply to the Plaintiff's additional material facts. *See* N.D. Ind. L.R. 56-1(c)(2). In the interest of deciding the case on the merits, the Court considers all facts offered by the parties that are supported by a citation to evidence. The Court also includes additional facts from some of the cited exhibits to provide additional context.

Avenue in Hammond, Indiana, related to a parking dispute; both were wearing body cameras capturing the audio and video footage of the incident at issue in the Amended Complaint. Am. Compl. ¶ 33; Def. Exs. A-1 (Def. Carrasco's Body Camera Footage, Part 1), A-2 (Def. Bigham's Body Camera Footage), A-3 (Def. Carrasco's Body Camera Footage, Part 2), ECF No. 66. Defendant Carrasco arrived on scene at 5:11 p.m. and interviewed the complainant, who reported that she believed the Plaintiff had threatened her sister because she parked her car in front of his house—on a public parking street, providing additional details about a history of related problems over the prior year. Def. Ex. A-1, 0:00:23–00:01:19.

Then the Plaintiff exited his house and walked towards Defendant Carrasco but before Defendant Carrasco could say anything to the Plaintiff, he told Defendant Carrasco that "I own the FBI, the police, and all" and to "look my name up – McClelland. That's all I gotta [sic] say." *Id.*, 0:01:20–34. Next, the Plaintiff walked back up the steps into his home. *Id.*, 0:01:35–38. Defendant Carrasco explained to the Plaintiff that he lives on a public street and that the complainant and her sister are allowed to park their cars there, after which the Plaintiff entered his home and slammed the door. *Id.*, 0:01:38–47. Defendant Carrasco and Defendant Bigham remained on the scene gathering further details from the complainants. *Id.*, 0:01:47–0:06:37.

Eventually, the Plaintiff exited his home with his car keys in hand. *Id.*, 0:06:37. He approached his vehicle—a red GMC truck, pulling away in his truck with the loud sound of tires spinning on the footage. Def. Ex. A-2, 0:06:54–58. Defendant Carrasco stated that this was cause for an "unsafe start" ticket, and Defendant Bigham agreed. *Id.*, 0:06:58–0:07:01. Defendant Bigham decided to write the Plaintiff a ticket and waited for him to come back onto the street in his truck. *Id.*, 0:07:02–0:08:11. Defendant Bigham exited his police car and approached the Plaintiff, who had already exited his truck, on foot. *Id.*, 0:08:11–20. However, the Plaintiff

continued walking toward his house despite Defendant Bigham's instruction to stop. *Id.*, 0:08:20–25.

Defendant Carrasco then exited his police car and approached the Plaintiff and Defendant Bigham. Def. Ex. A-3, 0:00:39–46. Defendant Bigham asked the Plaintiff for his license and registration, which he responded were inside his house; as a result, Defendant Bigham told the Plaintiff to retrieve his license and registration because Defendant Bigham intended to issue him a ticket. Def. Ex. A-2, 0:08:25–30; Def. Ex. A-3, 0:00:46–51. The Plaintiff began walking up to his house, where his wife was waiting at the front door, and the Plaintiff asked why he was being given a ticket, to which Defendant Bigham informed him it was for an unsafe start. Def. Ex. A-2, 0:08:30–32. Mrs. McClelland asked what was going on, to which Defendant Bigham informed her that he needed the Plaintiff's license and registration; and the Plaintiff began to enter his home, so Defendant Bigham warned him that if he did not return with his license and registration, Defendant Bigham would tow his truck. Def. Ex. A-2, 0:08:32–43; Def. Ex. A-3, 0:00:58–0:01:03. As the Plaintiff continued arguing with Defendant Bigham and threatening to sue him, Mrs. McClelland begged her husband to "stop" and go into the house to retrieve his license and registration. Def. Ex. A-2, 0:08:43–53; Def. Ex. A-3, 0:01:03–13.

Defendant Bigham then approached the door to the enclosed front porch, where Mrs. McClelland was standing. Def. Ex. A-2, 0:08:53–55. Defendant Bigham attempted to open the porch door; however, Mrs. McClelland was holding the door handle. Def. Ex. A-2, 0:08:55–58; Def. Ex. A-3, 0:01:14–16. Mrs. McClelland then said "ow," and the Plaintiff exited the house into the enclosed front porch, where he continued arguing with Defendant Bigham. Def. Ex. A-2, 0:08:58–0:09:02; Def. Ex. A-3, 0:01:16–0:01:20. Mrs. McClelland, again, asked her husband to "stop." Def. Ex. A-2, 0:09:02–05; Def. Ex. A-3, 0:01:20–24. The Plaintiff told Defendant Bigham "f*ck you," and Defendant Bigham told him to come outside. Def. Ex. A-2, 0:09:05–08;

Def. Ex. A-3, 0:01:25–27. Then the Plaintiff went back inside his house at the instruction of his wife. Def. Ex. A-2, 0:09:08–18; Def. Ex. A-3, 0:01:28–38. Defendant Bigham instructed Mrs. McClelland that he still needed the Plaintiff's license and registration, and that if he did not get them, he would tow the Plaintiff's truck; he also explained to her why the Plaintiff was getting a ticket. Def. Ex. A-2, 0:09:18–39; Def. Ex. A-3, 0:01:38–58. Mrs. McClelland then went into the house to tell the Plaintiff that he needed to bring out his license and registration. Def. Ex. A-2, 0:09:39–54; Def. Ex. A-3, 0:01:59–0:02:12.

The Plaintiff exited the house into the enclosed front porch where he, again, argued with Defendant Bigham stating that his "whole family is law enforcement" and that he didn't "have time for this sh*t." Def. Ex. A-2, 0:09:54–57; Def. Ex. A-3, 0:02:12–15. Defendant Bigham instructed the Plaintiff to exit the porch and give him his driver's license, but instead, the Plaintiff retreated back towards his house and told Defendant Bigham to "come up." Def. Ex. A-2, 0:09:57–10:13; Def. Ex. A-3, 0:02:15–31. The Plaintiff then sat down on his front porch, and Mrs. McClelland told Defendant Bigham to "be patient" and went into the front porch to ask the Plaintiff to give Defendant Bigham his license. Def. Ex. A-2, 0:10:13–21; Def. Ex. A-3, 0:02:32–40. The Plaintiff gave his license to his wife, who in turn handed it to Defendant Bigham. Def. Ex. A-2, 0:10:21–24; Def. Ex. A-3, 0:02:40–43. Defendant Bigham and Defendant Carrasco went back to Defendant Bigham's car for Defendant Bigham to issue the Plaintiff a ticket from inside his police vehicle. Def. Ex. A-2, 0:10:24–0:17:56; Def. Ex. A-3, 0:02:43–0:10:16.

**B. Use of Force**

A few minutes later, the Plaintiff approached Defendant Bigham's vehicle and asked for both officers' names. Def. Ex. A-2, 0:17:57–0:18:07; Def. Ex. A-3, 0:10:16–26. The Plaintiff initially walked away—back towards his home; however, he then returned and approached

Defendant Carrasco, who was standing next to Officer Bigham's driver's side door, until he was within arm's reach. Def. Ex. A-2, 0:18:07–22; Def. Ex. A-3, 0:10:26–41. Defendant Carrasco placed one hand against the Plaintiff's chest to prevent him from approaching any closer. Def. Ex. A-2, 0:18:23–26; Def. Ex. A-3, 0:10:41–44. The Plaintiff swatted Defendant Carrasco's hand away and began yelling not to touch him. Def. Ex. A-2, 0:18:26–29; Def. Ex. A-3, 0:10:44–48. Mrs. McClelland then stood in between the Plaintiff and Defendant Carrasco and attempted to lead her husband away from the police vehicle and back towards their home; at the same time, Defendant Bigham exited his police car. Def. Ex. A-2, 0:18:29–34; Def. Ex. A-3, 0:10:48–54. Mrs. McClelland then accused Defendant Bigham of "smashing" her finger in the porch door. Def. Ex. A-2, 0:18:34–41; Def. Ex. A-3, 0:10:54–59. The Plaintiff then joined in and began yelling at Defendant Bigham that he "smashed" his wife's finger in the front door, and Mrs. McClelland continued to lead the Plaintiff towards their home. Def. Ex. A-2, 0:18:41–52; Def. Ex. A-3, 0:10:59–0:11:10.

Mrs. McClelland asked Defendant Bigham if she could take the ticket and leave, but the Plaintiff continued yelling and Defendant Bigham instructed him to turn around. Def. Ex. A-2, 0:18:52–57; Def. Ex. A-3, 0:11:10–15. Defendant Carrasco then grabbed the Plaintiff's right arm, and Defendant Bigham grabbed the Plaintiff's left arm and placed him in handcuffs. Def. Ex. A-2, 0:18:57–0:19:22; Def. Ex. A-3, 0:11:15–40. Defendant Bigham informed the Plaintiff that he was being arrested for disorderly conduct, and the Plaintiff then, again, accused Defendant Bigham of smashing Mrs. McClelland's finger in the porch door. Def. Ex. A-2, 0:19:11–19; Ex. A-3, 0:11:30–38. Defendant Carrasco and Defendant Bigham adjusted the Plaintiff's restraints, and he continued arguing and yelling at Defendant Bigham. Def. Ex. A-2, 0:19:19–25; Def. Ex. A3, 0:11:38–42. While being handcuffed, the Plaintiff said, "I'm not

resisting," and Defendant Bigham responded, "No you're not. You're not." Def. Ex. A-2, 0:19:09–12.

Defendant Carrasco walked back towards Defendant Bigham's police vehicle, leaving the Plaintiff in the custody of Defendant Bigham. Def. Ex. A-3, 0:11:42–48. But he returned to the Plaintiff and Defendant Bigham seconds later. *Id.*, 011:49–51.

The Plaintiff continued arguing with Defendant Bigham about his wife's finger and called him a liar. Def. Ex. A-2, 0:19:25–28. Defendant Bigham began to walk the Plaintiff to his police vehicle. *Id.* The Plaintiff told Defendant Bigham not to push him. *Id.*, 0:19:28–29. Then the Plaintiff pulled away from Defendant Bigham, swinging his arms away behind his back. Def. Ex. A-2, 0:19:29–31; Ex. A-3, 0:11:48–49. The Plaintiff testified that he did not resist at any time after being handcuffed. Pl. Ex. B, 68:21–25; 70:18–21; 73:11–22.

Defendant Bigham grabbed the Plaintiff's arm and began to walk him toward Defendant Carrasco and the police vehicle. Def. Ex. A-2, 0:19:32–37; Def. Ex. A-3, 0:11:49–56. The Plaintiff testified that Defendant Bigham grabbed and squeezed his neck at the site of his recent surgery and did not merely hold his arm. Pl. Ex. B, 69:4–70:18.

Next, Defendant Carrasco placed both hands on the Plaintiff while positioning him against the passenger side of the police car, and Defendant Bigham held onto the Plaintiff with one hand and used his other hand to open the back door of the police vehicle. Def. Ex. A-2, 0:19:35–36; Def. Ex. A-3, 0:11:54–55. The Plaintiff's deposition testimony was that Defendant Bigham had him by the neck. *See* Pl. Ex. B, 71:1–17.

Defendant Carrasco's report states that he used a "Neck Restraint." Pl. Ex. C., p. 3, ECF No. 70-3 ("Force used by *this* Officer against Citizen . . . Neck Restraint – Force Effective: Yes." (emphasis added)).

Defendant Bigham additionally instructed the Plaintiff to "get in" the backseat of the vehicle. Def. Ex. A-2, 0:19:37–39; Ex. A-3, 0:11:55–57. The Plaintiff refused to sit down inside the vehicle, instead yelling "see this" at his wife, who also continued arguing with the officers. Def. Ex. A-2, 0:19:38–40; Ex. A-3, 0:11:56–58. The Plaintiff's deposition testimony was that he physically could not bend because of his recent neck surgery, and he told the officers he can't bend. Pl. Ex. B, 71:1–5, 18–22.

Defendant Bigham instructed him again to "get in" to the car. Def. Ex. A-2, 0:19:40–41; Def. Ex. A-3, 0:11:58–59. Defendant Bigham testified that he agreed that *his* body camera did not capture much of the interchange at the open door of his police vehicle because the body camera was down at his chest. Pl. Ex. A, 152:20–153:3, ECF No. 70-1 (referencing the time leading up to the video time stamp of 17:31:14, as shown on Defendant Bigham's body camera (Def. Ex. A-2, 0:19:40)).

However, at video time stamp 17:31:13–21 (Def. Ex. A-3, 0:11:57–0:12:07), Defendant Carrasco's body camera footage shows that: (1) the Plaintiff was at first standing up facing the police vehicle with his back to Defendants Carrasco and Bigham while Defendant Bigham's left hand was at the Plaintiff's arms with his left elbow at an approximately 90 degree angle; (2) then Defendant Bigham briefly transferred his left hand to the outside of the police vehicle while the Plaintiff pivoted his body around to face Defendant Bigham; (3) Defendant Bigham also moved his right hand from the police vehicle passenger door to in front of his body; and (4) then Defendant Bigham began pushing on the Plaintiff's front mid-section area with both hands. Also, Defendant Carrasco's contemporaneous supplemental narrative states that the Plaintiff "hit his left side of his head and neck area after refusing to get into the vehicle." Pl. Ex. D, ECF No. 70-4.

During that time, the Plaintiff told the officers that he has "metal in [his] neck" and continued telling his wife, "See this," all while refusing to sit down inside the vehicle. Def. Ex. A-2, 0:19:41–47; Def. Ex. A-3, 0:11:59–0:12:04. The Plaintiff reiterates that his testimony was that he did not sit down because he was physically unable to bend. Pl. Ex. B, 71:1–5, 18–22.

After that, the Plaintiff called the officers "racist motherf***** cops" and continued to refuse to sit down inside the vehicle. Def. Ex. A-2, 0:19:47–50; Def. Ex. A-3, 0:12:04–07. Officer Carrasco then went around to the other side of the police vehicle at the driver's rear passenger door. Def. Ex. A-3, 0:12:07–13.

Defendant Bigham's footage shows that he placed both his hands on the Plaintiff's front mid-section area and attempted to push him into the vehicle, and the Plaintiff continued refusing to sit down making his body rigid and used profanities towards Defendant Bigham. Def. Ex. A-2, 0:19:50–54. And Defendant Bigham testified that the officers "pushed on his stomach" in attempting to place him in the police vehicle. Pl. Ex. A, 98:12–15. He also testified that "the side of [the Plaintiff's] head or face" struck the doorjamb of the patrol car. *Id.*, 97:9–11. The Plaintiff testified Defendant Bigham had him by the neck, squeezed it, and slammed it into the door frame and door. Pl. Ex. B, 69:4–73:10.

The Plaintiff remained standing up outside of the police car as his wife begged him to "get in the car, please." Def. Ex. A-2, 0:19:55–58; Def. Ex. A-3, 0:12:15–18. Finally, with Officer Carrasco moving to the other side of the vehicle and without Officer Bigham using physical force to make him do so, the Plaintiff sat down inside the back seat of the police car. Def. Ex. A-2, 0:19:56–59; Def. Ex. A-3, 0:12:16–17. The Plaintiff testified that Defendant Bigham forcibly pushed him into the police vehicle after his body "just gave in" from the pain, and that he could not recall exactly how Defendant Bigham got him in because he was in "excruciating pain." Pl. Ex. B, 72:25–73:10.

Defendant Carrasco and Defendant Bigham secured the backseat of the police vehicle. Def. Ex. A-2, 0:19:59–0:20:01; Def. Ex. A-3, 0:12:17–20. With the Plaintiff secured in the backseat of the police vehicle, Defendant Bigham informed Mrs. McClelland where she could pick up her husband. Def. Ex. A-2, 0:20:02–15; Def. Ex. A-3, 0:12:20–23.

Based on the body camera video and audio footage of Defendants Carrasco and Bigham, at no point during these interactions did the Plaintiff make any verbal indication that he was in pain or physical discomfort. *See* Def. Ex. A-2, 0:18:57–0:19:59; Def. Ex. A-3, 0:11:15–0:12:16. In contrast, the Plaintiff testified that he was "screaming, telling [Defendant Bigham] you're squeezing my hardware, I'm handicapped," and told him repeatedly "I can't bend." Pl. Ex. B, 70:10–13; 71:1–18. Nevertheless, at no point in the body camera video and audio footage of Defendants Bigham and Carrasco does the Plaintiff scream or say "you're squeezing my hardware, I'm handicapped" or "I can't bend." *See* Def. Exs. A-1, A-2, A-3. Defendant Bigham testified that, on the scene, he heard the Plaintiff say, "I have metal in my neck." Pl. Ex. A, 150:21–151:1.

The entire physical encounter, from the time Defendant Carrasco first took hold of the Plaintiff's left arm until the Plaintiff was seated inside the police vehicle, lasted approximately 62 seconds. Def. Ex. A-2, 0:18:57–0:19:59; Def. Ex. A-3, 0:11:15–0:12:16. The Plaintiff testified as to repeated squeezing of his neck and repeated slamming of the neck into the door frame. *See* Pl. Ex. B, 71:6–72:13.

The Plaintiff was charged with disorderly conduct and resisting law enforcement, though both charges were ultimately dismissed. *See State of Indiana v. McClelland*, Case No. 45D09-2209-CM-004515; Pl. Ex. E, ECF No. 70-5.

## C. The Plaintiff's Injuries

The Defendants' medical expert, Dr. Richard B. V. Fontes, M.D., Ph.D., is an associate professor of Neurosurgery at Rush University Medical Center. Def. Ex. B-1, p. 1, ECF No. 63-2. He completed his Doctor of Medicine degree at Universidad de Sao Paulo, Brazil, in 2002 and his neurosurgery residency at Hospital das Clinicas da Universidad de Sao Paulo, Brazil, in 2008 followed by a complex and minimally-invasive spine fellowship at Rush University Medical Center in 2010 and a second residency in neurosurgery at the same institution in 2015. *Id*. Dr. Fontes regularly treats patients with spinal conditions, including those resulting from trauma, degenerative changes and deformity, and is familiar with the standard of care for diagnosing and treating conditions of the spine and the causes of those conditions. *Id*. Dr. Fontes reviewed the Plaintiff's records of medical treatment, including imaging studies, from: University of Illinois Hospital, Dr. Ankit Mehta (the Plaintiff's neurosurgeon), and Franciscan Health. *Id*. Dr. Fontes also reviewed the video footage of the Plaintiff's encounter with the Hammond Police on September 4, 2022. *Id*.

Based on those records, Dr. Fontes opined that the Plaintiff has a significant history of spinal disease and treatment for a man of his age. *Id*. Specifically, prior to his encounter with the Hammond Police on September 4, 2022, he had undergone four spinal surgeries (spinal fusions) for degenerative disease. *Id*. Imaging studies show multi-level degenerative disease with previous surgery and instrumentation at C3–C4 prior to September 2022. *Id*.

Dr. Fontes also opined that, of significance, the Plaintiff was a smoker. *Id*. Dr. Fontes further stated that nicotine use is strongly correlated with increased disc degeneration, worse surgical outcomes, and higher rates of revision surgery. *Id*., pp. 1–2. He additionally opined that the video of the Plaintiff's September 4, 2022 altercation with the Hammond Police was unimpressive from the perspective of his spinal issues and condition. *Id*., p. 2. In support, Dr.

Fontes points out that following the Plaintiff's arrest, he presented to the Franciscan Health Hammond Emergency Department with complaints of neck pain. *Id*. However, imaging showed the previous surgical changes and degenerative disease but no clinical evidence of trauma or acute injury. *Id*.

Dr. Fontes also stated that the Plaintiff returned to the University of Illinois and underwent additional imaging studies and treatment. *Id*. He opined that the imaging studies show progression of his degenerative disease with adjacent segment disease. *Id*. He stated that the Plaintiff underwent two-stage, cervical fusion procedures at the University of Illinois in December 2022. *Id*. He also stated that the Plaintiff expressed continuing complaints of pain and symptoms following his December 2022 procedures and ultimately received disability. *Id*. He further stated that the Plaintiff has continued treatment, which includes repeat imaging that continues to show degenerative changes and further deterioration in his spine. *Id*. Dr. Fontes opined that the Plaintiff's records reflect implant loosening at C6, and they also reflect that he has continued smoking, which Dr. Fontes again states correlates with a higher incidence of implant problems and poorer outcomes. *Id*.

Ultimately, based on the above, Dr. Fontes' opinion is that the Plaintiff's spinal issues are the result of his degenerative disc disease and continued nicotine use. *Id*. It is also Dr. Fontes' opinion that there is no clinical evidence that his altercation with the Hammond Police on September 4, 2022 caused or contributed to cause any of his spinal complaints or issues. *Id*.

The Plaintiff testified that he had recovered from his most recent (April 2022) surgery and returned to his work a month later as a lead industrial mechanic and welder. Pl. Ex. B, 17:4, 26:2–4, 30:6–8. The Plaintiff also testified that his treating neurosurgeon, Dr. Ankit Mehta—who performed his prior surgeries—said that the September 4, 2022 incident damaged the hardware placed in April 2022 and necessitated the December 2022 revision surgery. *Id*., 34:6–35:18. He

further testified that, after the incident, he was declared "totally disabled" by the Social Security Administration after being examined by three SSA doctors. *Id.*, 172:25–173:12. And he testified that the disability determination was directly related to the injuries he suffered during the September 4, 2022 incident. *Id.*, 173:16–20.

## ANALYSIS

The Defendants seek summary judgment on all the Plaintiff's claims.

### A. Federal Claims—42 U.S.C. § 1983

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state law], . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that the defendants deprived him of a federal constitutional right and that the defendants acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006) (citations omitted).

#### *1. § 1983 Fourth Amendment Excessive Force Claim Against Defendant Bigham*

In the Amended Complaint, the Plaintiff brings a § 1983 excessive force claim against Defendant Bigham for his purported conduct in the Plaintiff's arrest. The Plaintiff contends that Defendant Bigham used excessive force when he grabbed, squeezed, and slammed the non-resisting Plaintiff's neck into the police vehicle door frame with such force that it damaged the surgical hardware in his neck and necessitated a revision neck surgery. Defendant Bingham contends that the force used on the Plaintiff was reasonable under the circumstances and that, even if the amount of force used on the Plaintiff was not objectively reasonable, Defendant

Bigham is entitled to qualified immunity because it was not clearly established that use of force in the circumstances of this case violated the Fourth Amendment.

The Fourth Amendment prohibits the use of excessive force by a police officer during an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989); U.S. Const. amend. IV. The Fourth Amendment's objective reasonableness standard governs claims of excessive force by a police officer. *Graham*, 490 U.S. at 388. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012)). The totality of the circumstances considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, . . . circumscribed by the Fourth Amendment's insistence on reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 396).[2] The reasonableness of an officer's use of force is a legal determination for the court. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Phillips*, 678 F.3d at 520. But the Court "defer[s] to a jury's determination of what occurred during an arrest or whose testimony is credible." *Phillips*, 678 F.3d at 520. This means that in cases where all material facts are undisputed, "reasonableness is a pure question of law" for the court. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

---

[2] Because the Plaintiff does not develop an argument that his arrest for disorderly conduct and resisting law enforcement was not supported by probable cause with support from pertinent legal authority, he waives any such argument. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)). Thus, the two questions are "whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citation omitted). Courts may consider these two prongs in either order. *Est. of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). "The Supreme Court has held that a right is clearly established for qualified immunity purposes if its contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022) (cleaned up). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (cleaned up). "That sounds like a high bar because it is—qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021) (cleaned up).

Against qualified immunity for Defendant Bigham, the Plaintiff argues that the right of a handcuffed, non-resisting arrestee to be free from significant, gratuitous force was clearly established well before September 2022. Without analysis, the Plaintiff marshals three cases to support his position; but while those cases support the general proposition that it is excessive to use significant force on a suspect that was subdued—not moving, not resisting or evading arrest, or not responding—the arrestees in those cases, unlike the Plaintiff here, were actually subdued. *See Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013) ("[I]t was clearly established

on June 25, 2007, that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over."); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) ("Officer Pauley's force in arresting a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with such minor offenses, was not objectively reasonable."); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 529 (7th Cir. 2012) ("That is, it was clearly established in November 2005 that officers could not use such a significant level of force on a nonresisting or passively resisting individual.").

True, here the Plaintiff testified that he was not resisting at any time. But the Court does not credit that testimony because the body camera audio and video footage establishes "with confidence and beyond reasonable question" that the Plaintiff was resisting going to the police vehicle and sitting in the police vehicle to be taken into custody. *Pam v. City of Evansville*, 154 F.4th 523, 529 (7th Cir. 2025) ("Instead, like any piece of evidence filtered through the prism of summary judgment, videos that establish a fact with confidence and beyond reasonable question may eliminate factual disputes." (cleaned up)). Specifically, the footage establishes that, after the Plaintiff had been handcuffed, he acted belligerently (or not cooperatively and docilely) swinging his arms behind his back to pull away from Defendant Bigham, ignoring Defendant Bigham's commands to get in the police vehicle, making his body rigid against getting in the police vehicle, and cursing at Defendant Bigham. *See Jackson v. City of Madison*, 176 F.4th 1005, 1026 (7th Cir. 2026) ("But, when he got downstairs, Jackson continued to act belligerently, taking several steps toward an officer posted outside his kitchen, repeatedly gesturing and cursing at the officers, and refusing commands."). And the Plaintiff does not argue, let alone show, that the footage showing the Plaintiff resisting was edited, tampered with, or

otherwise defective or deficient.

Nor does the Court credit the Plaintiff's testimony that he screamed—or otherwise said—that he was handicapped, just had neck surgery, could not bend, or was in pain because the body camera audio footage establishes that the Plaintiff never said any such things; and, again, the Plaintiff does not argue let alone show that the body camera audio footage was edited, tampered with, or otherwise defective or deficient.[3]

Moreover, the Plaintiff points to his testimony that Defendant Bigham "saw the surgical area" on his neck. Pl. Ex. B, 69:7. The Plaintiff's statement about what Defendant Bigham saw "is, at best, the sort of self -serving and uncorroborated testimony by a party that does not create a genuine dispute of fact." *Forrest v. Prine*, 620 F.3d 739, 746 (7th Cir. 2010). Specifically, the testimony is insufficient at the summary judgment stage because it is conclusory, as the Plaintiff does not provide any more details such as how he knew Defendant Bigham saw the surgical area on his neck or what made the surgical area on his neck obvious. *See Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) ("[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." (citations omitted)).[4]

Further, the Plaintiff supports his argument with his testimony that Defendant Bigham forcibly pushed him into the police vehicle after his body just gave in from the pain. However, the Court does not credit this testimony because the body camera footage contradicts the

---

[3] At 17:31:15, the body camera footage shows that the Plaintiff said that he has metal in his neck, which is just after the Plaintiff asserts that the force took placed based on his reference to Defendant Bigham's testimony about his body camera not catching the force at issue—in reference to 17:31:14. Thus, the statement is not relevant. Even if it were, the Plaintiff does not develop an argument about the statement's significance with citation to pertinent legal authority. Thus, he waives any such argument. *See Mahaffey*, 588 F.3d at 1146.

[4] The Court notes that the Plaintiff's neck surgery was in April 2022, approximately five months before the September 2022 arrest that is at issue. As a result, the Plaintiff's lawyer's characterization of the Plaintiff's surgical site as "fresh" is not well-taken. Pl. Br. 1–2, 4, 11, 12, 13, 15, 17, 18, ECF No. 68.

testimony as it shows that the Plaintiff sat down in the police vehicle on his own volition by bending at his knees and waist. *See Pam*, 154 F.4th at 529.

Thus, it is undisputed that the Plaintiff in this case was not subdued, and it is undisputed that the Plaintiff did not inform Defendant Bigham that the Plaintiff was handicapped, just had neck surgery, could not bend, or was in pain. And there is no evidence that Defendant Bigham saw the surgical area on the Plaintiff's neck before he used force or that the Plaintiff's body just gave in from pain. The Court notes there is also no evidence that Defendant Bigham used force against the Plaintiff after the Plaintiff sat down inside the police vehicle suggesting that Defendant Bigham used no more force than was necessary to get the actively resisting Plaintiff into the police vehicle and take him into custody. *See Abbott*, 705 F.3d at 728 ("Indeed, it is undisputed that Sweeney used the taser until Travis stopped fighting but did not use it thereafter, suggesting that Sweeney used no more force than was necessary to gain control of the actively resisting Travis.").

Against this conclusion about resisting, the Plaintiff points out that Defendant Bigham said that he knew that the Plaintiff was not resisting. However, the body camera footage shows that this verbal exchange occurred when Defendant Bigham was initially handcuffing the Plaintiff, at a point in time when the Defendants do not dispute that the Plaintiff was not resisting. The Court notes that the Plaintiff does not assert that excessive force by Defendant Bigham took place during or before the handcuffing. Therefore, Defendant Bigham's statement about not resisting during the initial handcuffing is irrelevant.

Contrary to the Plaintiff's assertion about causation, all he establishes about causation with his testimony is that: (1) the force Defendant Bigham used caused him neck pain that he described as excruciating; and (2) he went to the emergency room and made an appointment to see his neurosurgeon the day after the arrest because something in his neck was not right.

Nevertheless, the Defendants present undisputed evidence of imaging showing no trauma or acute injury. The Defendants also establish through Dr. Fontes' report that the Plaintiff's later spinal complaints and issues and total disability were caused by his pre-existing degenerative disc disease and nicotine use and that force by Defendant Bigham did not cause or contribute to cause any of his spinal complaints or issues. *See Abdullahi v. City of Madison*, 423 F.3d 763, 770–71 (7th Cir. 2005).[5]

Indeed, the Plaintiff attempts to establish—with his own testimony about what his neurosurgeon and the Social Security Administration said—that the damage to the surgical hardware in his neck, December 2022 revision surgery, and total disability were caused by Defendant Bigham's force. However, purported statements by his neurosurgeon and the Social Security Administrate constitute inadmissible hearsay because are out-of-court statements being used to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802; *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("To be considered on summary judgment, evidence must be admissible at trial, . . . . If the evidence is inadmissible hearsay, the courts may not consider it." (citation omitted)). Therefore, the Court concludes that the Plaintiff has not supported with evidence that the Court may consider his assertion that the damage to the surgical hardware in his neck, his December 2022 revision surgery, or his total disability were caused by Defendant Bigham's force.

Relatedly, the Plaintiff highlights his deposition testimony that he had recovered from his most recent (April 2022) surgery and returned to work as a lead industrial mechanic and welder before September 4, 2022. Pl. Ex. B, 26:2–4; 29:1–3. Thus, it appears the Plaintiff is attempting

---

[5] The Court notes that, although the Plaintiff attacks Dr. Fontes' report because he did not personally examine the Plaintiff, the Plaintiff does not establish that an examination would have revealed something that conflicted with Dr. Fontes' opinion. And "'mere speculation or conjecture' will not defeat a summary judgment motion." *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997)).

to establish with his lay opinion that Defendant Bigham's purported force caused his need for revision surgery and his disability. A lay opinion may be used to prove causation "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864–65 (7th Cir. 2010) (citations omitted).

Here, the Court finds that the primary facts cannot be described to the jury such that they could draw correct conclusions from common understanding. The "primary facts" in this case include that the surgery was not until December 2022, three months after the purported force, which is not a "close temporal proximity." *Id*. at 865. Instead, it is undisputed that the imaging taken at the emergency room a day after the purported force (in close temporal proximity) showed only the Plaintiff's previous surgical changes and degenerative disease but no clinical evidence of trauma or acute injury. Also, there is undisputed evidence of "possible intervening causes" in that medical expert Dr. Fontes opined that the Plaintiff's spinal issues are the result of his degenerative disc disease and continued nicotine use, correlating with a poorer outcome and the Plaintiff's medical history reveals he had undergone four spinal surgeries (spinal fusions) for degenerative disease prior to the September 2022 arrest at issue. *Id*. In light of these primary facts, the Plaintiff's testimony is not "enough evidence from which a reasonable jury could conclude as a matter of lay judgment that the [purported] excessive use of force . . . caused" the Plaintiff's need for revision surgery and disability. *Id*. at 864. For that, the Plaintiff would need a medical expert's opinion; which he does not provide. *See id*.

Additionally, it is undisputed that the force used by Defendant Bigham was non-lethal. "The use of non-lethal force 'against an actively resisting subject either does not violate a clearly

established right or is constitutionally reasonable,'" even if it inflicts pain. *Jackson*, 176 F.4th at 1027 (quoting *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018)); *see Jackson v. City of Madison*, No. 22-CV-689, 2024 WL 2803326, at *7 (W.D. Wis. May 31, 2024) ("But the use of significant force that inflicts pain and blunt trauma is reasonable if a person is actively resisting arrest, which can include physically lashing out at officers or 'declining to follow instructions while acting in a belligerent manner.'" (quoting *Dockery*, 911 F.3d at 467)), *aff'd*, 176 F.4th 1005. And "[o]ne example of active resistance is declining to follow instructions while acting in a belligerent manner, as opposed to being docile and cooperative." *Jackson*, 176 F.4th at 1027 (cleaned up). In this case, the Plaintiff establishes with his testimony that he did not get in the police vehicle when Defendant Bigham commanded because he could not bend the way Defendant Bigham wanted him to bend (though there is no evidence the Plaintiff informed Defendant Bigham of his bending issue). Also, it is undisputed that Defendant Bigham applied force to the Plaintiff resulting in neck pain, and the next day the Plaintiff went to the emergency room because something was not right with his neck and he made an appointment to see his neurosurgeon; but it is also undisputed that imaging showed no trauma or acute injury. Plus, it is undisputed that Defendant Bigham's force did not cause or contribute to his spinal issues (damage to his surgical hardware or need for revision surgery), and there is no evidence that the force caused the Plaintiff's total disability.

Reviewing the body camera footage and the undisputed facts in the light most favorable to the Plaintiff, an officer certainly would have reasonably—but mistakenly (because the Plaintiff testified he could not bend)—concluded that the force used was justified because the Plaintiff swung his arms pulling away from Defendant Bigham while being walked to the police vehicle and the Plaintiff declined to follow Defendant Bigham's instructions while acting in a belligerent manner or not being docile and cooperative. *Id.* ("Reviewing the body camera footage

and the undisputed facts in the light most favorable to Jackson, an officer certainly could have reasonably, but mistakenly, concluded that force was justified because Jackson was []declining to follow instructions while acting in a belligerent manner.”). Even if the Court credits the Plaintiff’s testimony that Defendant Bigham grabbed and squeezed the Plaintiff’s neck and slammed his neck against the police vehicle’s door frame, the force was such that it resulted in neck pain the Plaintiff described as excruciating but imaging showed did not result in trauma or an acute injury. That and the other “circumstances surrounding [the force] [are] at most on the hazy border between excessive and acceptable force, requiring an analog in case law to defeat qualified immunity for the officers.” *Id*. (quoting *Pam*, 154 F.4th at 532). Here, the Plaintiff has not met his burden to cite such a case.

Therefore, even viewing the facts in the Plaintiff’s favor, the Court cannot say that the choice to use the force—grabbing, squeezing, and slamming the Plaintiff’s neck against the police vehicle’s door fame that resulted in pain described as excruciating but did not result in trauma or acute injury—against the actively resisting Plaintiff to get him into the police vehicle to take him into custody was a decision that only plainly incompetent officers or officers who knowingly violate the law would make. Accordingly, the Court finds that Defendant Bigham is entitled to qualified immunity on the Plaintiff’s excessive force claim.

*2. Failure to Intervene Claim Against Defendant Carrasco*

In the Amended Complaint, the Plaintiff brings a § 1983 claim against Defendant Carrasco for “failure to intervene” in the alleged excessive force by Defendant Bigham. The legal standard for a “failure to intervene” claim is:

> [a]n officer who is present and fail[ed] to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Abdullahi*, 423 F.3d at 774 (citation omitted). However, in this case, the Court found that Defendant Bigham is entitled to qualified immunity on the Plaintiff's excessive force claim, as discussed above because it was not clearly established that the force used against the actively resisting Plaintiff violated the Fourth Amendment. Because it was not clearly established that Defendant Bigham's actions constituted excessive force, it follows then that Defendant Carrasco could not be on fair notice that failure to intervene would violate the Plaintiff's Fourth Amendment rights. *Cf. Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005) ("Because we have determined that the officers' actions inside the apartment constituted neither an illegal search nor an illegal seizure, we must conclude that the Leafs do not have a cognizable claim against Deputy Shelnutt for failing to intervene in Deputy Jacobs' actions."); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("As we have demonstrated, Gill's right to be free from these interrogation tactics was not clearly established. It follows then, that the detectives would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene."). Thus, the Court finds that Defendant Carrasco is entitled to qualified immunity as to the claim against him for a failure to intervene in the alleged excessive force by Defendant Bigham.

**B. State Law Claim**

In the Amended Complaint, the Plaintiff brings a claim under Indiana law against the Defendant City of Hammond for indemnification, which the Plaintiff does not dispute hinges on his establishing a claim for violation of the Fourth Amendment for excessive force against Defendant Bigham or for a failure to intervene against Defendant Carrasco. Because Defendants Bigham and Carrasco are entitled to qualified immunity as to the Amended Complaint's federal claims, the Court grants the motion for summary judgment as to the Plaintiff's Indiana state law claim for indemnification against Defendant City of Hammond.

**CONCLUSION**

For the reasons set forth above, the Court hereby GRANTS the Defendants' Joint Motion for Summary Judgment [ECF No. 63].

There being no claims remaining between any parties, the Court DIRECTS the Clerk of Court to ENTER FINAL JUDGMENT stating:

> Final judgment is entered in favor of the Defendants Hammond Police Officer James Bigham, Hammond Police Officer J. Carrasco, and City of Hammond and against the Plaintiff Dwayne McClelland, who takes nothing on the federal and state claims in the Amended Complaint.

SO ORDERED on October 28, 2026.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT